FILED
 2009 Jul-14 AM 10:08
U.S. DISTRICT COURT
    N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | |
|---|---|
| STEPHANIE A. BAUGH,   } | |
| } | |
| **Plaintiff,**   } | |
| } | |
| v.   } | Case No.: 5:08-CV-0733-RDP |
| } | |
| MICHAEL J. ASTRUE, Commissioner   } | |
| of Social Security,   } | |
| } | |
| **Defendant.**   } | |

## MEMORANDUM OF OPINION

Plaintiff Stephanie A. Baugh brings this action pursuant to Section 205(g) of the Social Security Act ("the Act") seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying her application for a period of disability and disability insurance benefits ("DIB") under Title XVI.  *See* 42 U.S.C. §§ 405(g), 1383(c)(3).  For the reasons that follow, the Commissioner's decision is affirmed.

**I.     Proceedings Below**

Plaintiff filed her application for a period of disability and DIB on April 25, 2005, alleging an onset date of disability of February 1, 2000.  (Tr. 43).  The application was denied, and Plaintiff sought review of her case by an Administrative Law Judge ("ALJ").  A hearing was held before ALJ Randall C. Stout on January 17, 2007.  (Tr. 445-96).  In his May 5, 2007 decision, the ALJ determined that Plaintiff was ineligible for disability and DIB, finding that:  (1) Plaintiff was last insured on June 30, 2002; (2) her impairments, though severe, did not meet the requirements of the Act as of the date last insured; (3) Plaintiff possessed the residual functional capacity ("RFC") to perform a full range of medium work; and (4) Plaintiff's impairments did not prevent her from

engaging in past relevant work. (Tr. 19-25). On February 22, 2008, the Appeals Council denied Plaintiff's request for review of the ALJ's decision , therefore making the ALJ's decision the final decision of the Commissioner and subject to review by this court. (Tr. 6).

Plaintiff was born on April 5, 1974. (Tr. 60). She completed one year of college. (Tr. 69). Plaintiff has held four jobs in the 15 years preceding her alleged onset date of disability. From 1990 to 1994, Plaintiff worked as a cashier. For two of these years (1990 to 1992), she also worked as a secretary. From 1997 to 1999, Plaintiff worked as a sales representative for a carpet company. Finally, Plaintiff worked as an outside sales representative from April 1999 until February 2000, her alleged onset of disability. (Tr. 64-65). Plaintiff asserts a number of conditions that prevent her from working: myasthenia gravis, fibromyalgia, thyroid cancer, arthritis, depression, nervousness, chronic fatigue, migraines, and irregular heartbeat. (Tr. 63).

Prior to February 2000, Plaintiff complained to her primary physician, Dr. Hood, of joint pain/stiffness. (Tr. 203). Dr. Hood referred Plaintiff to Dr. R. Macon Phillips of Rheumatology Associates of Alabama, who concluded that Plaintiff had fibromyalgia. (Tr. 205). Following her onset date of disability, Plaintiff has been treated for several conditions: thyroid cancer, hyper/hypo-thyroidism, tachycardia, generalized weakness, intermittent pain, hoarseness, and depression. She consulted Dr. Brockington, a neurologist, from December 5, 2002 to February 28, 2003, complaining of generalized weakness. Upon preliminary examination, Dr. Brockington suspected several possible causes, including myasthenia gravis, polymyositis, B12 deficiency, sarcoidosis and other autoimmune myopathies. (Tr. 440). However, blood tests, nerve conduction studies, and repetitive nerve stimulation (RNS) tests were negative. (Tr. 441-44).

On August 31, 2001, Plaintiff underwent a right thyroid lobectomy following the discovery of a small mass on her right thyroid. (Tr. 280, 288). Dr. Kirby I. Bland successfully excised the mass, which was identified as a Hurthle cell adenoma. (Tr. 280). Plaintiff was placed on 75 micrograms (mcg) of Synthroid, a thyroid replacement drug. (Tr. 309).

Plaintiff subsequently complained of arrhythmia. (Tr. 270). She was examined at UAB's Kirklin Clinic on March 20, 2002. (Tr. 270). A thyroid ultrasound, EKG, and other tests came back normal. (Tr. 271-79). Plaintiff saw Dr. Jeremy Hon, a hematologist/oncologist, on April 10, 2002. (Tr. 298). Dr. Hon ordered a thyroid ultrasound and an iodine uptake test (Tr. 299), both of which appeared normal. (Tr. 300-01). Dr. Hon informed Plaintiff that there was nothing for him to treat. (Tr. 297). Plaintiff requested that he send her to an endocrinologist, and Plaintiff was referred to Dr. Bobby N. Johnson. (Tr. 309, 297).

Plaintiff saw Dr. Johnson on June 20, 2002. (Tr. 309). They discussed the efficacy of a complete thyroidectomy, which Dr. Johnson advised against. (Tr. 309). Plaintiff agreed to remain on suppressive medication, and Dr. Johnson increased her Synthroid to 100 mcg. (Tr. 309). On July 23, 2002, Plaintiff appeared for a follow-up. (Tr. 308). She reported feeling better on the new dosage of Synthroid. (Tr. 308). Plaintiff appeared again on August 27, 2002, feeling more nervous and complaining of chest pain when she moved her arms. (Tr. 307). Dr. Johnson suspected that Plaintiff might have costrochondritis and wrote her a prescription for Naprosyn. (Tr. 307). On September 3, 2002, Dr. Johnson increased Plaintiff's prescription for Levoxyl to 137 mcg. (Tr. 306). When Plaintiff returned to Dr. Johnson on October 2, 2002, she complained of depression and crying spells. (Tr. 306). She told Dr. Johnson that she had experienced severe anxiety and at one point told her husband that she wanted a divorce. (Tr. 306). Dr. Johnson hypothesized that Plaintiff's reported

3

symptoms were a result of an increase in her dosage of Levoxyl. (Tr. 306). He stopped Plaintiff's thyroid medication (Synthroid) and made plans to restart the medication four days later, but on a lower dosage. (Tr. 306, 283).

On October 16, 2002, Plaintiff returned to Dr. Bland's office. (Tr. 283). She had "few complaints" and appeared to be doing well on the reduced dosage of Synthroid. (Tr. 283). Some swelling and tenderness was noted along the trachea. (Tr. 283). A thyroid ultrasound showed no change of the right lymph node; however, a left node appeared, which had not been definitively seen on prior scans. (Tr. 284). The radiologist recommended a follow up scan in one year's time (Tr. 284).

On October 28, 2002, Plaintiff was admitted to Jackson County Hospital, complaining of tachycardia, neck pressure, and right shoulder pain. (Tr. 127-28). The EKG showed an elevated heart rate, but there were "no other major things, except for the rate." (Tr. 128). Although Plaintiff did not appear to be in acute distress, she was admitted for evaluation. (Tr. 128). Tests revealed no abnormalities (Tr. 129-10); however, the treating physician suspected that Plaintiff could be hyperthyroid due to her recent decrease in medication. (*Id.*).

On October 31, 2002, Plaintiff returned to Dr. Johnson, who decreased her medication to 75 mcg. (Tr. 305). She returned again on December 29, 2002, with complaints of tachycardia. (Tr. 304). Dr. Johnson made plans to recheck her lab work. (Tr. 304).

On January 3, 2003, Plaintiff met with Dr. Jeffrey T. Harris, a neurologist. (Tr. 132). Plaintiff complained of generalized weakness, as well as intermittent headaches, dizziness, and bladder control problems. (Tr. 132). Dr. Harris ran numerous tests: MRI of the cervical spine, MRI of the brain, EMG of the bilateral lower extremities, nerve conduction studies, a thyroid profile, lime

titer, and a rheumatoid work up, all of which were normal. (Tr. 132). Plaintiff's cognition upon discharge was normal. (Tr. 133). Although Plaintiff exhibited tremors, they were "effort dependent." (Tr. 133). When Plaintiff got tired or distracted, the tremors stopped. (Tr. 133). The same was found true of her strength and motor abilities. (Tr. 133). Dr. Harris noted that Plaintiff exhibited "a contradiction in the motor exam when she seemed to indicate that she was having a great difficulty pulling herself up out of the bed, but showed an ability to stand upright without a trunk lean and holding her trunk in an erect posture." (Tr. 135). A myasthenia gravis profile was pending at the time of discharge, but Dr. Harris expected it to come back negative based on the foregoing results. (Tr. 132). He concluded that Plaintiff's symptoms were functional. (Tr. 132). Drs. Richard Morgan and A. Alapati concurred with the diagnosis. (Tr. 133).

From January 20, 2003 through March 23, 2003, Plaintiff's medical history was reviewed by Dr. Lewis S. Blevins, a neurologist at the Vanderbilt Pituitary Center. (Tr. 347-53). In his preliminary assessment, Dr. Blevins suspected that Plaintiff might be hypothyroid on her current dose of Synthroid, but "seriously doubt[ed]" that the hypothyroidism was contributing to her neurological symptoms. (Tr. 352). After completing his review of Plaintiff's records, Dr. Blevins concluded that Plaintiff had received appropriate treatment. (Tr. 348). He did not recommend additional surgery, but advised increasing Plaintiff's medication. (Tr. 347-48).

On March 21, 2003, Plaintiff saw Dr. Daniel Ortiz complaining of persistent hoarseness and loss of voice. (Tr. 334). Dr. Ortiz recommended a total thyroidectomy. (Tr. 334). After being advised of alternative treatment options, Plaintiff agreed. (Tr. 332). On May 6, 2003, Plaintiff's remaining thyroid gland was removed. (Tr. 328, 157).

From July 22, 2003 until May 14, 2004, Plaintiff continued to see Dr. Ortiz for treatment of allergy-like symptoms, hypertrophic scarring, and intermittent hoarseness. (Tr. 316-24). At one point, Plaintiff also complained of neck pain, malaise, chills, and low grade fever, which Dr. Ortiz treated with broad-spectrum anti-biotics. (Tr. 321).

On March 15, 2004, Plaintiff reported to Dr. Bernice Craze, her primary physician, complaining of right foot pain. (Tr. 216). Finding no heel spur or stress fracture, Dr. Craze suspected tendonitis and suggested Plaintiff stop running, which she had been doing for some time prior to the visit. (Tr. 216). On June 15, 2004, Plaintiff complained of low blood pressure, nausea, heart racing, fatigue, and light-headedness after being struck by lightning on the preceding Memorial Day holiday. (Tr. 213). Dr. Craze inferred that the symptoms could be a result of the lightning strike. (Tr. 214).

On July 20, 2004, Plaintiff saw Dr. Asha Nuthi, an ophthalmologist, with regard to twitching of the eyelids. (Tr. 354). Dr. Nuthi believed that the twitching was due to a recurrence of myasthenia gravis but referred Plaintiff to a neurologist, Dr. Usha Nuthi, for additional examination. (Tr. 354).

On October 26, 2004, Plaintiff returned to Dr. Phillips, who assessed that Plaintiff was "holding her own." (Tr. 202). All lab studies appeared normal or negative, and Dr. Phillips could not appreciate any synovitis or definite weakness. (Tr. 200). As in 1998, he attributed Plaintiff's symptoms to fibromyalgia. (Tr. 202, 205).

Dr. Usha Nuthi referred Plaintiff to Dr. Shin Oh, another neurologist. (Tr. 191, 171). Dr. Oh found no evidence of neuromuscular transmission failure and diagnosed Plaintiff with chronic fatigue syndrome, for which he prescribed Mestinon. (Tr. 192).

6

On May 25, 2005, Plaintiff was seen by Dr. Craze complaining of chest pain. (Tr. 207). Plaintiff was administered an EKG, which showed no abnormalities (Tr. 207); however, a CAT scan uncovered a gallstone. (Tr. 220, 420). It was removed laparoscopically by Dr. Mark Carpenter on June 21, 2005. (Tr. 392).

Plaintiff returned to Dr. Phillips on several occasions from July 8, 2005 through January 19, 2007. (Tr. 252, 408-10). Each time, Plaintiff appeared to be "doing well," with no signs of synovitis or progressive deformity. (Tr. 252, 408-10). Dr. Phillips described Plaintiff's range of motion as good. (Tr. 408).

From August 4, 2005 until January 25, 2007, Plaintiff complained of numerous conditions to her primary physicians (Drs. Craze and Brewer): diffuse joint aches, muscle aches, depression, excessive thirst, frequent urination, left wrist pain, worsening fatigue, poor sleep quality, radiating body aches, rashes, ear-ringing, congestion, and itchy/swollen/watery eyes. (Tr. 416-19). Her doctors prescribed Valtrex, a cream, and allergy medications for the rash, congestion and itchy/watery eyes. (Tr. 414). Plaintiff was referred to a massage therapist for her body aches (Tr. 412), which helped, but did not provide lasting relief. (Tr. 411). Dr. Brewer prescribed Provigil for her chronic fatigue and Elavil for her depression. (Tr. 418). Additionally, Dr. Craze prescribed Darvocet, a pain reliever, after Plaintiff twisted her ankle on March 11, 2006. (Tr. 413). Dr. Craze noted that Plaintiff was already taking Mobic, an anti-inflammatory/pain reliever. (Tr. 413).

**II.     ALJ Decision**

Determination of disability proceeds under a five step analysis. 20 C.F.R. § 404.1520(a). First, the Commissioner determines if the claimant is engaged in substantial gainful activity. 20 C.F.R. § 1520(a)(4)(I). If the claimant is engaged in substantial gainful activity, she is not deemed

to be disabled under the Act. Second, the Commissioner determines if the claimant has a severe, medically determinable impairment that meets the duration requirement. 20 C.F.R. § 404.1520(a)(4)(ii); 20 C.F.R. 1509. If the claimant does not possess such an impairment, she is not disabled. Third, the Commissioner decides if the impairment meets or medically equals the criteria for an impairment listed in Appendix 1 of Part 404. 20 C.F.R. § 404.1520(a)(4)(iii). If it does not, the claimant is not disabled. Fourth, the Commissioner determines whether the claimant possesses the RFC to do past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can perform past relevant work, she is not disabled. Fifth, the Commissioner determines whether the claimant can perform other work in the national economy based on her RFC, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(v). If she can perform other work, the claimant is not disabled. If the claimant is deemed disabled or not disabled at any point in the process, the analysis ends. 20 C.F.R. § 404.1520(a)(4).

The ALJ found that Plaintiff last met the insured status requirements of the Act as of June 30, 2002, and that she had not engaged in substantial gainful activity between her alleged onset date of disability of February 1, 2000, and her date last insured of June 30, 2002. (Tr. 19). The ALJ determined that Plaintiff suffered from obesity, mild fibromyalgia, mild disc bulging at L4/5, a history of micropapillary cancer of the thyroid, and a history of myasthenia gravis. (Tr. 19). While these impairments were found to be severe, the ALJ concluded that they did not meet or medically equal one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1. (Tr. 22). Upon consideration of the record, the ALJ determined that the medical evidence did not reasonably support Plaintiff's complaints of debilitating fatigue, pain, and weakness before her date last insured. (Tr. 23-24). He further determined that Plaintiff possessed the RFC to perform a full range of medium

work, including Plaintiff's past relevant work, which the vocational expert classified as light to sedentary in nature.  (Tr. 24).

### III.    Plaintiff's Argument for Remand or Reversal

Plaintiff seeks to have the ALJ's decision reversed, or in the alternative, remanded for further consideration.  (Doc. # 1, at 2).  Plaintiff puts forth two reasons why this court should grant the relief sought: (1) the ALJ's RFC finding is not supported by substantial evidence, and (2) the ALJ's finding that Plaintiff's claims are not entirely credible is not supported by substantial evidence.  (Doc. # 6, at 2).

### IV.    Standard of Review

The only issues before this court are whether the record reveals substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the correct legal standards were applied.  *See Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  Title 42 U.S.C. §§ 405(g) and 1383© mandate that the Commissioner's findings are conclusive if supported by "substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  The district court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead it must review the final decision as a whole and determine if the decision is reasonable and supported by substantial evidence.  *See id.* (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239) (other citations

omitted). If supported by substantial evidence, the Commissioner's factual findings must be affirmed even if the evidence preponderates against the Commissioner's findings. *See Martin*, 894 F.2d at 1529. While the court acknowledges that judicial review of the ALJ's findings is limited in scope, the court also notes that review "does not yield automatic affirmance." *Lamb*, 847 F.2d at 701.

**V.     Discussion**

The court rejects Plaintiff's arguments for remand and/or reversal. For the reasons outlined below, the court finds that the ALJ relied on substantial evidence and applied the correct legal standards.

**A.     The ALJ Did Not Err in Determining That Plaintiff Had the RFC to Conduct a Full Range of Medium Work**

Plaintiff contends that the ALJ's RFC finding is not supported by substantial evidence. In particular, Plaintiff argues that the ALJ's "assessment was merely conclusory and did not contain any real rationale or reference to supporting evidence." (Doc. # 6, at 2). The court disagrees.

The ALJ prefaced his findings with a thorough recitation of the facts in the record, (Tr. 19-22), followed by specific references to evidence underlying the RFC finding. (Tr. 23-24). Regarding the latter, the ALJ focused on the following: (1) prior to the alleged onset date, Dr. Phillips noted that Plaintiff had "done extremely well" on her medication and predicted that she would probably continue to do well; (2) Dr. Phillips found no "definite weakness" or progressive deformity during subsequent visits; (3) following Plaintiff's surgery, her thyroid scans were totally normal; (4) Dr. Hon advised Plaintiff that "there was nothing for [him] to treat;" and (5) Dr. Johnson's notes indicate that Plaintiff felt better on Synthroid, had more energy, and was "doing well." (Tr. 23-24). The ALJ's findings fairly describe the facts in the medical record. The reports indicate that Plaintiff was in

good physical condition prior to the onset date of disability. They likewise show that Plaintiff's thyroidectomy did not entail significant after-affects, Plaintiff appeared to be doing well on Synthroid, and was energetic and free of discernible ailments. Her thyroid CT was normal. After her insured status expired, Plaintiff's rheumatologist found no definite weakness or progressive deformities. Based on these evaluations, there is substantial evidence that Plaintiff had the ability to engage in medium-range work.

To be sure, the record also shows that Plaintiff complained frequently of weakness, pain, and fatigue. In light of these subjective complaints, Plaintiff argues that the ALJ "primarily based his decision upon a perceived lack of credibility on the part of the [Plaintiff]." (Doc. # 6, at 2). But even if that is the case, this is not a basis for remand.

Unquestionably, the ALJ is entitled to weigh the credibility of Plaintiff's complaints. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (noting that it is within the ALJ's discretion to determine, after listening to the claimant's testimony, that her claims of pain were not credible); *see also Johns v. Bowen*, 821 F.2d 551, 557 (11th Cir. 1987); *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987); *Walker v. Bowen*, 826 F.2d 996, 1004 (11th Cir. 1987). Moreover, the ALJ "must articulate explicit and adequate reasons" for rejecting Plaintiff's subjective allegations. *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995) (with regard to pain); *see also Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987); *Caulder v. Bowen*, 791 F.2d 872, 880 (11th Cir. 1986) (requiring the ALJ to articulate his reasons for "giving no weight to the diagnoses accompanying the test results"). Had the ALJ failed to address Plaintiff's subjective complaints, there would be a better argument that grounds for remand would exist. However, the ALJ expressly concluded that Plaintiff's subjective

complaints do not merit credence. (Tr. 23). The only issue is whether that determination was in error. For the reasons explained below, the court finds it was not.

### B. The ALJ Did Not Err in Determining Plaintiff's Credibility

Plaintiff argues that the ALJ failed to rely on substantial evidence in finding that Plaintiff is not credible with regard to her subjective complaints. Plaintiff complained of debilitating pain, weakness, fatigue, dizziness, and arrhythmia. (Tr. 483-94). The ALJ found that these subjective complaints conflicted with the record evidence. (Tr. 23-24). The court finds no error in the ALJ's reasoning.

> These types of subjective allegations are analyzed under the "pain standard," which requires:
>
> (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote v. Chater*, 67 F.3d at 1560 (citing *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991)). The ALJ found that Plaintiff furnished sufficient evidence of underlying medical conditions which could conceivably cause the symptoms of which she complained. (Tr. 23). Plaintiff did not, however, satisfy either of the remaining conditions.

Plaintiff's complaints are contradicted by the record facts cited by the ALJ. Plaintiff alleges that she was disabled as of February 1, 2000. About a year prior to that date, Plaintiff saw Dr. Phillips, who believed that Plaintiff would continue to improve on her medication and was healthy enough for exercise. Plaintiff's period of insured status ended on June 30, 2002. Her treatment indicates no complications following her 2001 lobectomy. Her thyroid scans appeared normal, and Dr. Hon did not find anything he could treat. Dr. Johnson–an endocrinologist who Plaintiff

requested to see–assessed Plaintiff's condition similarly, noting that she was feeling better and "doing well." He also noted that she reported having more energy and doing more things. Plaintiff appeared to be in reasonably good physical condition after the procedure. When Dr. Phillips examined Plaintiff again in 2004, long after Plaintiff's insured status had expired, he found no indication of "definite weakness." Further, when Dr. Harris evaluated Plaintiff in early 2003, he found no medical evidence to substantiate Plaintiff's complaints. (Tr. 20-21). All of Plaintiff's tests were normal, and she demonstrated no strength or motor problems when "distracted with regards to her weakness." (*Id*.). Another neurologist, Dr. Oh, determined that Plaintiff demonstrated normal gait, memory, and cognition. (Tr. 21). Despite Plaintiff's complaints, she showed no signs of leg weakness, and tests revealed no findings suggestive of myasthenia gravis. (*Id*.). Likewise, the state agency determined that Plaintiff had no physical limitations. (Tr. 23). Based on these facts, it is clear that: (a) the objective medical evidence wholly fails to support Plaintiff's subjective complaints, and (b) the doctors' reports do not support Plaintiff's claimed symptoms or expressly belie their severity.

Plaintiff contends, nonetheless, that the ALJ merely cherry-picked the record to support his decision, disregarding facts favorable to Plaintiff's claim. (Doc. # 6, at 3-4). Indeed, the ALJ did not discuss every single fact in the record when arriving at his conclusion that Plaintiff possessed the RFC for medium work. However, the ALJ has no obligation to "'specifically refer to every piece of evidence in his decision'" as long as the decision allows the court to conclude that the ALJ considered the medical evidence as a whole. *Taylor ex rel. McCaster v. Comm'r of Soc. Sec. Admin.*, 216 Fed. Appx. 778, 781 n.1 (11th Cir. 2006) (quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005)).

The ALJ's decision contains a thorough description of the relevant facts (Tr. 19-22), including those that the ALJ supposedly ignored. In her brief, Plaintiff emphasizes the events surrounding her lobectomy in 2001, which was preceded by dysphagia (difficulty swallowing) and an episode of respiratory distress. (Doc. # 6, at 3). These events are fully recounted in the ALJ's decision, along with specific references to exhibits. (Tr. 20). Plaintiff further alleges that the ALJ ignored Plaintiff's visit to Dr. Johnson on June 20, 2002, when Plaintiff inquired into the wisdom of removing the rest of her thyroid gland. (Doc. # 6, at 4). However, the ALJ clearly cited this visit in his recitation of facts. (Tr. 20). Lastly, Plaintiff points to the ALJ's silence regarding her family history of thyroid cancer, even though the ALJ specifically stated that Plaintiff suffered from a history of thyroid cancer in his findings of fact. (Tr. 19).

Of the few omissions that can fairly be attributed to the ALJ, none add any weight to Plaintiff's claim of disability. For example, Plaintiff points out that the ALJ did not mention that Dr. Hon, in addition to telling Plaintiff that he had nothing to treat, also indicated that Plaintiff should follow up with her doctors in Birmingham. A generic suggestion to continue seeing one's other doctors does not imply that Plaintiff had any disabling condition. As Plaintiff herself admits, the record is devoid of reports that show Plaintiff's ailments were debilitating, or that Plaintiff had substantial physical limitations as a result of them. (Tr. 452).

## VI.  Conclusion

For the reasons stated above, the court concludes that the ALJ's determination that Plaintiff is not disabled is supported by substantial evidence and proper legal standards were applied in reaching this determination. The Commissioner's final decision is affirmed, and a separate order in accordance with this memorandum of opinion will be entered.

**DONE** and **ORDERED** this \_\_\_\_14th\_\_\_\_ day of July, 2009.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE